ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1101 (L),
Consolidated with 22-1171, 22-1256, 22-1273

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ALABAMA MUNICIPAL DISTRIBUTORS GROUP, *et al.*,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

## RULE 30(c) PROOF REPLY BRIEF FOR PETITIONERS
## SIERRA CLUB AND HEALTHY GULF

Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

Rebecca McCreary
Sierra Club
1650 38th St., Ste. 102W
Boulder, CO 80301
303-449-5595 ext. 103
rebecca.mccreary@sierraclub.org

*Attorneys for Sierra Club and Healthy Gulf*

Dated March 29, 2023

# TABLE OF CONTENTS

Table of Contents ...................................................................... i

Table of Authorities ................................................................ iii

Glossary ................................................................................ vii

Summary .................................................................................. 1

Statutes and Regulations ........................................................... 2

Argument ................................................................................. 3

    I.   The Evangeline Pass Project is "Connected" to Other Approvals Relating to the Plaquemines LNG Terminal ............................... 3

        A.   The Plaquemines LNG Terminal Depends upon Gas from the Evangeline Pass Project ..................................................... 4

        B.   The Pipeline Projects and Terminal Were Contemplated Concurrently ......................................................................... 6

        C.   Evangeline Pass Is Connected to the Department of Energy's Export Authorization ............................................... 8

        D.   Consideration of Cumulative Impacts Is Not a Substitute for Consideration of Connected Actions ................................ 9

    II.  FERC's Refusal to Consider Indirect Upstream and Downstream Impacts Was Arbitrary .............................................................. 10

        A.   The Department's Approval of Exports Does Not Relieve FERC of the Obligation to Consider Indirect Effects .......... 11

        B.   Indirect Greenhouse Gas Emissions Are Foreseeable Here 14

        C.   The Department of Energy's Analyses Do Not Satisfy FERC's NEPA Obligations ................................................. 19

    III. FERC Offered No Explanation of Whether or How It Considered Greenhouse Gas Emissions in Its Decisionmaking ................... 20

A.  Preparing an EIS Does Not Excuse FERC's Failure to Discuss the Significance and Severity of Greenhouse Gas Emissions ............................................................ 21

B.  Merely Providing "Context" About Greenhouse Gas Emissions Does Not Meet FERC's Obligations, Especially Where FERC Itself Refuses to Consider That Information 23

C.  FERC Did Not Demonstrate That It Was Impossible to Evaluate the Significance of Greenhouse Gas Emissions or Include Them in FERC's Decisionmaking ......................... 25

IV.  Vacatur Is Appropriate Here ...................................... 30

Conclusion ........................................................... 31

Certificate of Compliance .......................................... 33

Certificate of Service .............................................. 34

# TABLE OF AUTHORITIES

## Cases

*American Bird Conservancy, Inc. v. FCC,*
   516 F.3d 1027 (D.C. Cir. 2008) ......................................................... 22

*Big Bend Conservation All. v. FERC,*
   896 F.3d 418, 424 (D.C. Cir. 2018) ..................................................... 8

*Birckhead v. FERC,*
   925 F.3d 510 (D.C. Cir. 2019) .................................................... 16, 18

*City of Bos. Delegation v. FERC,*
   897 F.3d 241 (D.C. Cir. 2018) ......................................................... 4, 7

*City of Oberlin v. FERC,*
   39 F.4th 719 (D.C. Cir. 2022) .......................................................... 14

*Columbia Gas Transmission Corp. v. FERC,*
   477 F.3d 739 (D.C. Cir. 2007) ........................................................ 28

*CSX Transp. v. McBride,*
   564 U.S. 685 (2011) ...................................................................... 13

*Del. Riverkeeper Network v. FERC,*
   45 F.4th 104 (DC. Cir. 2022) ........................................................... 16

*Del. Riverkeeper Network v. FERC,*
   753 F.3d 1304 (D.C. Cir. 2014) ....................................................... 17

*Department of Transp. v. Public Citizen,*
   541 U.S. 752 (2004) ...................................................................... 13

*Dine Citizens Against Ruining Our Env't v. Haaland,*
   59 F.4th 1016 (10th Cir. 2023) ......................................................... 24

*EarthReports, Inc. v. FERC,*
   828 F.3d 949 (D.C. Cir. 2016) ......................................................... 12

*Food & Water Watch v. FERC*,
   28 F.4th 277 (D.C. Cir. 2022) ...................................................... 7, 17, 27

*Minisink Residents for Env't Pres. & Safety v. FERC*,
   762 F.3d 97 (D.C. Cir. 2014) ........................................................... 7, 9

*Mont. Wilderness Ass'n v. McAllister*,
   666 F.3d 549 (9th Cir. 2011) ............................................................... 17

*Myersville Citizens for a Rural Cmty. v. FERC*,
   783 F.3d 1301 (D.C. Cir. 2015) ............................................................. 7

*Realty Income Tr. v. Eckerd*,
   564 F.2d 447 (D.C. Cir. 1977) .............................................................. 31

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332, 352 (1989) ..................................................................... 22

*Sierra Club v. FERC*,
   827 F.3d 36 (D.C. Cir. 2016) ("*Freeport*") ....................................... 10, 11

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2016) ("*Sabal Trail*") .............. 1, 11, 13, 15, 22

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ....................................................... 30, 31

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
   6 F.4th 1321 (D.C. Cir. 2021) ......................................................... 12, 16

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) .............................................................. 26

## Statutes

15 U.S.C. § 717f.................................................................................... 11

15 U.S.C. § 717r.................................................................................... 28

5 U.S.C. § 706 ..................................................................................... 30

**Regulations**

40 C.F.R. § 1501.12 ....................................................... 19

40 C.F.R. § 1502.16 ....................................................... 22

40 C.F.R. § 1502.2 ........................................................ 13

40 C.F.R. § 1502.21 ....................................................... 12

40 C.F.R. § 1508.25 .................................................. 4, 6, 9

40 C.F.R. § 1508.8 .................................................... 13, 22

**FERC Orders**

*Atl. Coast Pipeline, LLC*,
   161 FERC ¶ 61,042 (Oct. 13, 2017) ..................................... 16

Certificate Policy Statement,
   88 FERC ¶ 61,227 (1999) ............................................... 17

Consideration of Greenhouse Gas Emissions in Natural Gas
   Infrastructure Project Reviews,
   178 FERC ¶ 61,108 (Feb. 18, 2022) .................... 16, 23, 28, 29

*Fla. Se. Connection*,
   162 FERC ¶ 61,233 (June 15, 2018) .................................... 26

*Mountain Valley Pipeline, LLC*,
   163 FERC ¶ 61,197 (June 15, 2018) ................................ 26, 28

*Nat'l Fuel Gas Supply Corp.*,
   158 FERC ¶ 61,145 (Feb. 3, 2017) ..................................... 16

*Northern Natural Gas Co.*,
   174 FERC ¶ 61,189 (2021) ............................................. 29

**Federal Register Notices**

Council on Environmental Quality, NEPA Guidance on Consideration of
  Greenhouse Gas Emissions,
  88 Fed. Reg. 1,196 (Jan. 9, 2023) ........................................................24

# GLOSSARY

| | |
|---|---|
| Certificate Order | Order Issuing Certificates and Approving Abandonment, *Tenn. Gas Pipeline Co.*, 178 FERC ¶ 61,199 (2022), R210 [JA___-___] |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| GHG | Greenhouse gas |
| JA___ | Joint Appendix page(s) |
| LNG | Liquefied natural gas |
| NEPA | National Environmental Policy Act |
| R___ | Record item |
| Rehearing Order | Order Addressing Arguments Raised on Rehearing, *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 (2022), R217 [JA___-___] |

# SUMMARY

FERC's conclusion that the Evangeline Pass Project was not "connected" to the Plaquemines LNG Terminal, or to other pipeline projects supplying gas to that terminal, was arbitrary. The record refutes FERC's claim that without Evangeline Pass, the terminal could receive gas from other sources: instead, the terminal will require the combined full capacities of all supply sources operating simultaneously. This was clear, and the Evangeline Pass Project was contemplated, when FERC was reviewing the terminal. FERC's approval was further connected to the Department of Energy's authorization of exports, and FERC's cumulative effects analysis does not cure improper exclusion of connected actions.

FERC separately erred by refusing to consider indirect effects related to production and use of the gas transported by the Evangeline Pass Project. Because FERC approved this project under Natural Gas Act Section 7, the Department of Energy's approval of exports does not place any more limit on FERC's authority than the state approval of power plants did in *Sierra Club v. FERC*, 867 F.3d 1357, 1372-73 (D.C. Cir. 2016) ("*Sabal Trail*"). The record here demonstrates that both

upstream and downstream greenhouse gas emissions are reasonably foreseeable. And FERC did not rely on the Department's analyses, nor could FERC have done so without further analysis.

Finally, FERC arbitrarily refused to state whether it considered greenhouse gas emissions to be significant, or to demonstrate whether and how it weighed these impacts in its public interest analysis. The question of significance matters beyond the threshold decision of whether to prepare an Environmental Impact Statement ("EIS"). Providing information that the public might use to form its own opinion about significance does not relieve FERC of the obligation to make and disclose its own determination. And unlike in prior cases, in the record here, FERC did not argue that FERC was incapable of doing so. Nor would the record have supported such a claim.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum.

## ARGUMENT

## I.  THE EVANGELINE PASS PROJECT IS "CONNECTED" TO OTHER APPROVALS RELATING TO THE PLAQUEMINES LNG TERMINAL

The Plaquemines LNG terminal depends upon gas supplied by the Evangeline Pass Project; other sources of gas must operate in conjunction with, rather than as alternatives to, Evangeline Pass. This was already clear when FERC authorized the Terminal. While Respondents argue that the Department of Energy's LNG export authorization and FERC's pipeline approvals cannot be "connected actions" as a matter of law because the Department and FERC are different agencies, such a rule does not exist, and this Court should not create one. Finally, Respondents suggest that FERC's "cumulative" impacts analysis should excuse any NEPA deficiencies in its evaluation of "connected actions." But the obligations to consider connected actions and cumulative effects are distinct, require consideration of different facts, and do not substitute for one another.

## A. The Plaquemines LNG Terminal Depends upon Gas from the Evangeline Pass Project

Neither the Evangeline Pass Project nor the Plaquemines LNG terminal would have "substantial independent utility" without the other. *City of Bos. Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018).

Respondents do not dispute that the Evangeline Pass Project "will not proceed unless" the Plaquemines LNG terminal is built. 40 C.F.R. § 1508.25(A)(1)(ii) (2019). This should itself end the connected action inquiry; Respondents cite no authority holding that actions must bilaterally depend on each other to be connected.

In the alternative, the record demonstrates that the Plaquemines LNG terminal depends upon the Evangeline Pass Project as well. Evangeline Pass would deliver nearly a third of the gas the Terminal will need to operate. The terminal will draw on three other sources of supply: (1) the existing Tennessee Gas pipeline capacity; (2) capacity on the Texas Eastern pipeline, provided by the Venice Extension project, and (3) capacity on the Columbia Gulf pipeline, via the East Lateral Xpress project. It will take the full capacity of all four of these sources to

provide the terminal, as amended, with the 3,892,000 dekatherms per day of gas it would need:



*Plaquemines LNG and related pipeline gas flows, in 1000s of dekatherms per day. See Opening Br. 15, 18, 24-25, 27.*

Thus, these pipelines do not provide an "array" of "options" the terminal can pick and choose from. FERC Br. 39-40. Intervenors speculate that Evangeline Pass's capacity could be replaced by a non-FERC-jurisdictional pipeline, Interv. Br. 14-15, but nothing in the record or Intervenors' brief indicates that such an alternative is available, or could be. To the contrary, the EIS concluded that no other existing or planned pipeline could substitute for Evangeline Pass, R203 at 48-49 [JA___-___]. The record demonstrates that the Plaquemines LNG terminal needs the Evangeline Pass Project, and Respondents offer no facts suggesting otherwise. Indeed, Intervenors ultimately concede that

the Evangeline Pass Project is key to the Terminal's viability, arguing

that vacatur would "harm Plaquemines LNG's ability to use the

Terminal." Interv. Br. 37.

The Plaquemines LNG terminal therefore "will not proceed," as

approved, without the Evangeline Pass Project. 40 C.F.R. §

1508.25(a)(1)(ii) (2019). Nor would it proceed without the Venice

Extension and East Lateral Xpress projects. FERC's approval of these

projects, and the Department of Energy's related approval of exports

from the terminal, are therefore "interdependent parts of a larger

action." *Id.* at 1508.25(a)(1)(iii).

## B. The Pipeline Projects and Terminal Were Contemplated Concurrently

The fact that the Evangeline Pass Project application was not filed

until after FERC approved the Plaquemines LNG terminal does not

preclude, or even weigh against, finding that the actions were

connected.

Nothing in the regulatory text specifically requires a temporal

overlap between connected actions. Where this Court has found that

projects were not connected, factors other than timing demonstrated the

projects' independence. *Food & Water Watch v. FERC*, 28 F.4th 277, 291

(D.C. Cir. 2022) (holding that pipeline projects that served different purposes and different customers were not connected); *City of Bos.*, 897 F. 3d at 252 (projects were "financially and functionally" independent); *accord Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015); *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 113, n.11 (D.C. Cir. 2014).

This Court's flexible approach to timing is particularly appropriate here, where the need for the Evangeline Pass Project was obvious while FERC was reviewing the Plaquemines LNG terminal application. The terminal needs gas. Existing pipelines cannot provide enough. And Plaquemines LNG agreed to buy the gas that the Evangeline Pass Project would deliver while the Plaquemines FERC application was pending, even though the Evangeline application had not yet been filed. Certificate Order, PP1, 10 [JA___, ___]. The fact that this upgrade was needed, planned, and contracted for demonstrates a temporal overlap and connection between the projects. If it were otherwise, developers could strategically delay filing applications to segment NEPA review.

### C. Evangeline Pass Is Connected to the Department of Energy's Export Authorization

FERC makes two groundless arguments as to why the Evangeline Pass project and the Department of Energy's authorization of exports Plaquemines LNG are not connected actions. Both fail.

First, FERC asks this Court to restrict NEPA's "connected actions" requirement to projects approved by the same agency. No such requirement appears in NEPA or its implementing regulations, and this Court should decline FERC's invitation to invent a new limit on "connected actions" analysis not espoused by Congress or the Council on Environmental Quality. Healthy Gulf's opening brief explained why treating separate agencies' actions as connected furthers NEPA's purposes. Opening Br. 42-48. This Court's holding that "[t]he connected-actions doctrine does not require the aggregation of federal and *non-federal* actions" does not suggest otherwise. *Big Bend Conservation All. v. FERC,* 896 F.3d 418, 424 (D.C. Cir. 2018) (emphasis added).

Second, FERC suggests the Department of Energy's export authorizations are not connected because they do "not automatically trigger FERC's later review of any of the separate pipeline projects." FERC Br. 46. The "automatically trigger" language appears in one of

8

the three disjunctive definitions of connected actions; for the reasons stated above, the exports authorized by the Department "will not proceed" without the Evangeline Pass Project, and the authorizations for exports, the terminal, and the pipelines are all "interdependent." 40 C.F.R. § 1508.25(A)(1) (2019).

### D. Consideration of Cumulative Impacts Is Not a Substitute for Consideration of Connected Actions

Finally, Respondents argue, citing *Minisink*, that although FERC did not consider the three pipeline projects as "connected actions," it did evaluate all three as part of its "cumulative impacts" assessment. FERC Br. 42; Interv. Br. 17. *Minisink* did not hold that a cumulative effects analysis can cure an agency's failure to analyze connected actions. Instead, it held that the actions at issue were not connected, 762 F.3d at 113 n.11 and then separately held that FERC's cumulative impact analysis was adequate. *Id.* at 113. The cumulative impact and connected action requirements are distinct and serve different purposes; one is not a substitute for the other.

## II.  FERC'S REFUSAL TO CONSIDER INDIRECT UPSTREAM AND DOWNSTREAM IMPACTS WAS ARBITRARY

Healthy Gulf's opening brief explained that both NEPA and the Natural Gas Act required FERC to consider foreseeable indirect effects of FERC's actions; that in the pipeline context, this obligation included effects caused by production and end-use of the gas to be transported; and that other entities' authority over end uses did not relieve FERC of this obligation. Opening Br. 48-55.

In its response, FERC intermingles three counterarguments, all of which fail on the merits. Unlike in *Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) ("*Freeport*"), FERC was not *prohibited* from considering these indirect effects here. The record demonstrates that these impacts are foreseeable. And FERC cannot satisfy its obligations by pointing to the Department of Energy's prior analyses, where, *inter alia*, those analyses were not considered in the record, and were not particular to this project.

10

### A. The Department's Approval of Exports Does Not Relieve FERC of the Obligation to Consider Indirect Effects

In *Sabal Trail*, 867 F.3d at 173, this Court held that where, as here, FERC approves an interstate gas pipeline under Section 7 of the Natural Gas Act, 15 U.S.C. § 717f, FERC must consider reasonably foreseeable indirect effects relating to production and use of the transported gas.

Although FERC argues that this case is more like the *Freeport* LNG terminal case than the *Sabal Trail* pipeline decision, FERC ignores the keystone to *Freeport*'s analysis: that when FERC reviews LNG infrastructure under the Natural Gas Act Section 3 authority delegated by the Department of Energy, FERC's authority is cabined, due to the narrowness of that delegation. 827 F.3d at 40-41, 47-48. *Freeport* did not hold that the Department's authority over exports deprived FERC of authority it otherwise would have had: *Freeport* held that Section 3 never provided FERC with authority to consider indirect effects relating to gas production and end use when reviewing LNG infrastructure applications in the first place. *Id.*, *accord Sabal Trail*, 867 F.3d at 1372-73 (explaining that the key in *Freeport* was that FERC

"had no legal authority to consider" or "act on" information about effects of gas production and use). FERC offers no authority or mechanism limiting FERC's Section 7 authority akin to the Department's narrow delegation under Section 3.[1]

Intervenors (but not FERC) separately argue that only the Department, and not FERC, is the "proximate cause" of these indirect effects. Interv. Br. 23. *Sabal Trail* forecloses this argument as well. *Sabal Trail* held that Section 7 required FERC to consider lifecycle effects even though the pipeline would deliver gas to powerplants that were directly regulated by state and federal air permitting authorities, even though those lifecycle effects would not occur but for issuance of

---

[1] Intervenors note that *EarthReports v. FERC*, 828 F.3d 949 (D.C. Cir. 2016) involved both Section 3 approval of an export terminal and section 7 authorization of a pipeline compressor station. Interv. Br. 21. Although *EarthReports* briefly acknowledged FERC's use of Section 7 in its summary of the background, 828 F.3d at 952, *EarthReports* did not discuss Section 7 in its analysis, including the question of whether FERC's use of Section 7 there provided a possible ground for distinguishing *Freeport*. Because the parties did not present, and the Court did not discuss, arguments about Section 7 in that case, *EarthReports* did not establish precedent on this issue. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021) (holding that because *EarthReports* did not consider arguments about 40 C.F.R. § 1502.21, *EarthReports* did not preclude those arguments, even though underlying facts were similar).

the air permits. *Sabal Trail* 867 F.3d at 1375. Respondents offer no explanation as to why the Department's approval of exports is different than approval of the power plant in *Sabal Trail*. More broadly, proximate causation, which determines whether a person is sufficiently at fault for an existing harm that the person should be legally liable for it, *CSX Transp. v. McBride*, 564 U.S. 685, 692-93 (2011), is a poor fit for the "policies [and] legislative intent" underlying NEPA, *Department of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004), which serves to inform decisionmaking by identifying prospective impacts before they occur and, thus, while they can still be avoided. *See* 40 C.F.R. § 1502.2. The NEPA regulation requiring consideration of indirect effects does not impose a proximate cause requirement, 40 C.F.R. § 1508.8(b), and courts should not impose "judge-made proximate-cause formulations" that are not required by the statutory or regulatory text. *McBride*, 564 U.S. at 702-03.

Finally, FERC's decision to consider indirect *benefits*—upstream domestic job growth in the gas production industry—cannot be reconciled with FERC's refusal to consider greenhouse gasses emitted by that gas production. Opening Br. 50; *see* Certificate Order, P33 n.35

13

[JA___]. FERC responds that upstream production benefits, such as the jobs it quantified, are "directly related" to "new incremental transportation capacity," FERC Br. 58, without offering any explanation as to how harms associated with that same upstream gas production are not equally related. *Id.* (quoting Rehearing Order P64 [JA___]). *City of Oberlin v. FERC*, 39 F.4th 719, 727 (D.C. Cir. 2022) affirmed that FERC could consider indirect benefits of exporting gas in the Section 7 analysis, but nothing in that case suggests that FERC can asymmetrically consider benefits of gas production while excluding harms caused by that same activity.

## B.  Indirect Greenhouse Gas Emissions Are Foreseeable Here

The record demonstrates that FERC can reasonably foresee greenhouse gas emissions associated with upstream production and downstream use of the gas the pipeline will transport.

FERC does not seriously dispute that downstream emissions are reasonably foreseeable—indeed, FERC estimated that end-use of the gas transported by the Evangeline Pass Project will emit 21.24 million metric tons per year in carbon dioxide equivalent. R203 at 20 [JA___]. This is more than one hundred times the direct emissions from

operation of the Evangeline Pass Project. *Id.* FERC argues that it does not know where the gas will ultimately be exported to, FERC Br. 54-55, but FERC does not argue, and no record evidence suggests, that the ultimate destination meaningfully impacts the downstream emission total.[2] The fact that FERC actually estimated downstream emissions demonstrates that they can reasonably be foreseen; FERC's explicit refusal to consider that estimate in its decisionmaking, Certificate Order, P87 [JA___], Rehearing Order, P62 [JA___], violated both the Natural Gas Act and NEPA.

For upstream emissions, Healthy Gulf explained that Department of Energy tools enable FERC to provide similar estimates, *i.e.*, the emissions associated with producing the volume of gas delivered by the project. R161 at 16, Ex. K at 44 [JA___, ___] (estimating that producing each trillion cubic feet of gas "increase[s] upstream [greenhouse gas] emissions by 6.8 … to 5.8" million metric tons of carbon dioxide

_____

[2] While the destination may influence the extent to which delivered gas displaces other fossil fuels, FERC is not "excused from making emissions estimates just because the emissions in question might be partially offset by reductions elsewhere." *Sabal Trail*, 867 F.3d at 1374-75.

equivalent). Thus, this is not a case where the record contained no

evidence demonstrating the foreseeability of upstream impacts. *Cf. Del.*

*Riverkeeper Network v. FERC*, 45 F.4th 104, 109 (DC. Cir. 2022);

*Birckhead v. FERC*, 925 F.3d 510, 517 (D.C. Cir. 2019). And FERC has

itself repeatedly used these tools to estimate upstream emissions

associated with other individual pipelines. *See* Consideration of

Greenhouse Gas Emissions in Natural Gas Infrastructure Project

Reviews, 178 FERC ¶ 61,108 PP10-14 (2022) (summarizing FERC's

prior treatment of indirect effects, including use of these tools); *see also,*

*e.g., Atl. Coast Pipeline*, 161 FERC ¶ 61,042, P293 (2017) (estimating

upstream greenhouse gas emissions associated with an individual

pipeline); *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 PP185, 189

(2017) (same).

While more specific information about upstream gas production

would enable more nuanced analysis, the absence of such information is

not an excuse to ignore the issue entirely. NEPA requires FERC to do

the best it can, even in the face of incomplete information. *Vecinos*, 6

F.4th at 1329 (discussing 40 C.F.R. § 1502.21). "In requiring evaluation

of indirect effects, 'the statute does not demand forecasting that is not

meaningfully possible, [but] an agency must fulfill its duties to the fullest extent possible.'" *Food & Water Watch,* 28 F.4th at 285 (quoting *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014)); *accord Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 559 (9th Cir. 2011) (when faced with "imperfect data," "the proper response … is for [FERC] to do the best it can with the data it has, not to ignore the [issue] completely.").

FERC also overstates the uncertainty regarding upstream effects here. FERC's speculation that it is uncertain *whether* this pipeline will lead to additional gas production is unfounded. This is not a pipeline that will benefit the public by "eliminating bottlenecks, … lower[ing] costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives." FERC Br. 8 (quoting Certificate Policy Statement, 88 FERC ¶ 61,227, 61,748 (1999)). Instead, the sole function of this pipeline is to "meet[] unserved demand," *id.*, that is, to enable delivery of gas to the Plaquemines LNG terminal that would not otherwise occur. Thus, here, unlike in *Birckhead*, the record indicates that producers would not be able to

access this full demand without the pipeline. *Cf.* 925 F.3d at 517-18.
This case is further distinguished by the fact that record evidence here
specifically and quantitatively predicts how increasing exports
increases gas production, R161, 15 & Ex. J at 77 [JA___, ____]; that
Healthy Gulf identified modeling tools that FERC could have used, but
did not, to quantify upstream emissions, Opening Br. 54; R161, 15-16
[JA___-___]; and that FERC itself assumed that the pipeline would
stimulate additional gas production, citing the "domestic jobs"
associated with that production as one of the project's purported
benefits, Certificate Order, P33 n.35 [JA___].

Nor does uncertainty as to the "specific timing [or] location … of
upstream activities," FERC Br. 58, preclude reasonable forecasting
here. Although timing and location might matter for impacts like land
use, FERC explicitly acknowledged that greenhouse gas emissions have
the same impacts no matter where they are emitted. R203 at 18
[JA___]. The Department of Energy (and, previously, FERC) have
concluded that upstream greenhouse gas emissions can reasonably be
estimated without this information.

Thus, the record here demonstrates that FERC has the tools to reasonably foresee the upstream and downstream greenhouse gas emissions that will result from the gas production and use that will be enabled by the Evangeline Pass project.

### C.  The Department of Energy's Analyses Do Not Satisfy FERC's NEPA Obligations

As Healthy Gulf's opening brief explained, at 53, FERC could have cooperated with the Department of Energy in meeting its NEPA obligation, or tiered off of the Department's prior work as a stepping stone in providing the required climate analysis here. But FERC did not do so, and the Department's prior or forthcoming analyses do not themselves satisfy FERC's obligations.

Indeed, FERC admits that it did not consider or rely on the Department's prior work. FERC Br. 49; Rehearing Order, P62 & n.175 [JA___]. This is not a case where one agency reviewed a prior analysis, agreed with it, and alerted the public to that fact, whether through tiering, adoption, or any other mechanism. *See* 40 C.F.R. § 1501.12 (describing process for incorporation by reference). The problem here is not just that the required material was omitted from the EIS: analysis

19

of upstream effects does not appear in the record at all, and FERC explicitly states that it did not consider this part of the problem.

Even if FERC had purported to consider and tier off of the Department's prior work, that general analysis—which was not prepared under the NEPA process and was not specific to any individual LNG export proposal (much less the individual pipeline at issue here)—would have at most been a starting point for FERC's analysis, rather than a complete substitute for FERC's NEPA review.

## III.  FERC OFFERED NO EXPLANATION OF WHETHER OR HOW IT CONSIDERED GREENHOUSE GAS EMISSIONS IN ITS DECISIONMAKING

FERC still has not answered the basic question Healthy Gulf posed: whether FERC viewed the greenhouse gas emissions here as too trivial to matter in the public interest analysis, whether these emissions were important but outweighed by public benefit, whether FERC reached some other conclusion about these emissions, or whether FERC simply ignored them entirely. Opening Br. 63; R213 at 7 [JA___]. FERC's position may be that greenhouse gas emissions will *never* tip the scale and render a pipeline contrary to the public interest, no matter how great the emissions or how small the project's benefits. But

whatever FERC's position is, FERC needs to articulate it. Such candor is required so that courts can ensure that FERC has not acted arbitrarily, and so that elected officials who nominate and confirm the Commissioners, and who draft the laws FERC applies, can hold FERC to account.

Rather than demonstrating that it actually evaluated the importance of greenhouse gas emissions, FERC argues that it erred on the side of caution by preparing a full EIS, that FERC provided information that would allow the public to draw its own conclusions, and that it would have been impossible for FERC to make its own determination. FERC Br. 59-75. Each of these arguments is wrong.

### A. Preparing an EIS Does Not Excuse FERC's Failure to Discuss the Significance and Severity of Greenhouse Gas Emissions

The fact that FERC prepared an EIS here, rather than merely an environmental assessment, does not relieve FERC of the requirement to discuss the significance of greenhouse gas emissions, or render FERC's failure to do so a harmless error.

NEPA requires a hard look at the "ecological ..., aesthetic, historic, cultural, economic, social, [and] health" effects of agency actions. 40

C.F.R. § 1508.8. Once an agency has decided to prepare an EIS, that EIS must "discuss[] … the significance of [a project's] impacts," 40 C.F.R. § 1502.16(a). This is not just a binary choice to label impacts as significant or insignificant; agencies must discuss the "severity" of effects, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989), or *how* significant they are. This analysis is integral to the hard look NEPA requires, and to FERC's Natural Gas Act balancing of harms against benefits. *Sabal Trail*, 867 F.3d at 1373.

Intervenors incorrectly assert that "significance … bears *only* on the question of whether an agency must prepare an EIS." Intervenor Br. 25 (citing *American Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1034 (D.C. Cir. 2008)) (emphasis added). The regulations, caselaw, and common sense all require that after an agency determines that an EIS is warranted, the EIS still must discuss the severity or significance of the project's effects. *American Bird Conservancy* recognized that an EIS was required unless the agency could conclude that impacts would be insignificant, but did not hold that significance was only pertinent to this question, and did not address 40 C.F.R. § 1502.16. 516 F.3d at 1034.

**B.  Merely Providing "Context" About Greenhouse Gas Emissions Does Not Meet FERC's Obligations, Especially Where FERC Itself Refuses to Consider That Information**

FERC argues that it helped inform the public about greenhouse gas impacts by comparing project emissions with state and federal emission totals, and by estimating the social cost of greenhouse gas emissions. FERC Br. 61-68. But NEPA requires that informing the agency's own decisionmaking, as well as informing the public, and FERC must explain that decisionmaking.

Here, FERC first compared direct emissions from the Evangeline Pass Project with Louisiana, Mississippi, and national totals. Certificate Order P89 [JA___-___]. FERC did not use these comparisons to reach a conclusion about the significance of the project's emissions, and it would have been arbitrary for FERC to do so. In FERC's concurrently-issued draft greenhouse gas policy, FERC explained that although such comparisons can be "helpful," they are not an appropriate way to evaluate the significance of those emissions. 178 FERC ¶ 61,108, P96. The Council on Environmental Quality recently reaffirmed that:

> NEPA requires more than a statement that [project emissions] represent only a small fraction of global or domestic emissions. Such …

23

> comparisons and fractions … are not an appropriate method for characterizing the extent of a proposed action's … contributions to climate change because this approach does not reveal anything beyond the nature of the climate change challenge itself.

Council on Environmental Quality, NEPA Guidance on Consideration of Greenhouse Gas Emissions, 88 Fed. Reg. 1,196, 1,201 (Jan. 9, 2023). Courts and the Environmental Protection Agency ("EPA") agree. *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043-44 (10th Cir. 2023); EPA, Comments on Draft EIS, R197 at 1 [JA___] (quoting Council on Environmental Quality, Final Guidance on Consideration of Greenhouse Gas Emissions (Aug. 1, 2016)). FERC did not hold otherwise here, instead merely offering these comparisons for additional "context." Certificate Order, P89 [JA___]. And the context FERC provided was incomplete, because it only considered direct emissions. Combustion of the gas delivered by this project will emit 21.24 million tons of carbon dioxide equivalent per year, R203 at 20 [JA___], more than 10% of Louisiana's total emissions. Certificate Order, P89 [JA___].

Second, FERC estimated the social cost of the Evangeline Pass Project's direct greenhouse gas emissions. Certificate Order P93

[JA___]. This did help the public form its own opinions about the impact and significance of the project. But FERC explicitly refused to consider these estimates in making its own "determination regarding either the impact of the project's GHG emissions or whether the project is in the public convenience and necessity." *Id.* P92 [JA___-___]. Providing information that FERC itself ignored cannot satisfy FERC's obligation to weigh these impacts in FERC's NEPA or Natural Gas Act analyses.

### C. FERC Did Not Demonstrate That It Was Impossible to Evaluate the Significance of Greenhouse Gas Emissions or Include Them in FERC's Decisionmaking

FERC argues that although it provided information to the public, FERC did not make a determination about the significance of greenhouse gas emissions, or use this information in FERC's public interest analysis, because FERC "reasonably found it could not assess project impacts on climate change," and because Healthy Gulf did not "identify a workable method the Commission could have used to assess significance." FERC Br. 59, 69. (capitalization changed). These arguments are incorrect.

25

At the threshold, nowhere in the record did FERC claim that it would be impossible for FERC to determine whether the emissions here were significant. The EIS made the much narrower assertion that FERC could not "determine discrete resource impacts," and that "Commission staff [were] unable to assess the Project's contribution to climate change through any objective analysis of physical impact attributable to the Project." FERC Br. 61 (quoting EIS, R203, at 21 [JA___]). Even this narrow assertion was not cited or relied upon in the Certificate and Rehearing Orders, which provided different arguments for refusing to reach conclusions about greenhouse gas emissions. Certificate Order PP89-93 [JA___-___], Rehearing Order PP72-75 [JA___-___]. With good reason: the EIS's argument is factually incorrect. FERC has recognized that the social cost of carbon protocol is itself "a tool that can be used to estimate incremental physical climate change impacts." *Mountain Valley Pipeline*, 163 FERC ¶ 61,197 P290 (2018), *Fla. Se. Connection*, 162 FERC ¶ 61,233 P48 (same).[3]

---

[3] FERC errs in relying on *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013), FERC Br. 61-62. That case addressed a March 2010 agency decision, finalized mere weeks after the initial

26

Nonetheless, even if FERC's orders had concluded that it was impossible to analyze the "physical impact attributable to the project," FERC Br. 61, and factually supported this conclusion, that still would not support the broader conclusion that it would have been impossible for FERC to "assess project impacts on climate change" at all. FERC Br. 59. FERC itself effectively refuted this argument in the orders here, and in the concurrently-released draft greenhouse gas policy, both of which identify multiple ways to "assess project impacts" without directly assessing "physical impact attributable to the project." These included the social cost of carbon, comparison with emission reduction targets, or ad hoc analysis. Certificate Order, PP89, 92-93 [JA___, ____-____]; Rehearing Order, PP69-76 [JA___-____]. Healthy Gulf identified these alternative methods of analysis in its rehearing request, and rebutted FERC's criticisms thereof. R213 at 4-7 [JA___-___]. *Cf. Food & Water Watch*, 28 F.4th at 290 (holding that petitioners' rehearing request failed to identify what else FERC should have done).

---

social cost of carbon was published, R161 at 21, Ex. P at 2 [JA___], and neither the parties nor the Court raised the social cost of carbon.

On social cost of carbon, FERC argues that there are "no criteria to identify what monetized values are significant for NEPA purposes." FERC Br. 72.[4] FERC agrees that the tool is generally accepted in the scientific community, *id.*, and FERC does not dispute the validity of its estimates. FERC's claim is therefore that FERC cannot decide whether $137 million in harm is significant without guidance from other agencies. FERC Br. 67. This is absurd. FERC routinely weighs impacts to scenery, wetlands, forests, and other resources even without general standards. *See* Draft GHG Policy, 178 FERC ¶ 61,108, P54 n.137. The EPA, Council on Environmental Quality, and other federal agencies have found the social cost of carbon suitable for project-specific review even without a uniform threshold for significance of monetized impacts. *See* EPA Comments on Draft EIS, R197 at 2 [JA___]; *Mountain Valley Pipeline*, 163 FERC ¶ 61,197 P281 n.772 (enumerating other agencies that have used social cost of carbon in environmental review of

---

[4] This argument was not presented in the Certificate Order. *See* FERC Br. 72-74 (repeatedly citing Rehearing Order P75 [JA___], without citing the Certificate Order for this proposition). Accordingly, Healthy Gulf had good cause for not addressing this argument in its rehearing request. *Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 741-44 (D.C. Cir. 2007) (citing 15 U.S.C. § 717r(b)).

individual projects). And fundamentally, the issue is not just whether

climate impacts cross the threshold of "significance;" it is whether and

how FERC determined that the Evangeline Pass Project's benefits were

sufficient to outweigh these monetized harms. FERC does not need a

general significance threshold to help it make that determination.[5]

In the alternative, FERC could have passed judgment on the

Evangeline Pass Project's 145,247 tons per year of direct greenhouse

gas emissions without reference to the social cost of carbon. FERC

proposed a 100,000 ton per year threshold (including indirect emissions)

in its draft guidance, and explained why that threshold was reasonable.

178 FERC ¶ 61,108, P80. FERC provided an ad hoc analysis of

significance in *Northern Natural Gas Co.*, 174 FERC ¶ 61,189 (2021).

FERC states that it would *prefer* to wait until its general guidance is

finalized to analyze significance, but does not cite any authority holding

---

[5] The other concerns FERC notes in passing fare no better.
Although the social cost of carbon protocol had been challenged in court,
FERC was not enjoined from using it, and the tool remained generally
accepted in the scientific community. R213 at 5-6 [JA___-___]. FERC
speculated that it might, on further review, decide that the tool should
be modified, but this falls short of identifying any specific problem with
or criticism of the tool that could justify refusing to consider its
estimates here. *Id.*

that an agency can refuse to consider "an important aspect of the problem" now based on the agency's preference to formulate a general policy to apply in future proceedings.

## IV. VACATUR IS APPROPRIATE HERE

Vacatur is the default remedy for unlawful agency action. *See, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021); 5 U.S.C. § 706(2)(A). FERC offers no argument on remedy, and Intervenors' arguments for departure from the default fail.

First, Intervenors assert that Sierra Club's alleged deficiencies "are all related to NEPA," which would be "easily curable on remand." Interv. Br. 37. But "NEPA violations are serious notwithstanding an agency's argument that it might ultimately be able to justify the challenged action." *Standing Rock*, 985 F.3d at 1053. And Intervenors ignore that FERC's inadequate analysis undermined its public interest balancing under the Natural Gas Act, in addition to violating NEPA. Because the errors here stem from a lack of requisite analysis—not merely FERC's failure to fully document its decision—FERC is unlikely to be able to substantiate its decision on remand. *See id.*

Second, although the Plaquemines LNG terminal will ultimately depend on the Evangeline Pass Project, Intervenors do not demonstrate that it would be unduly disruptive if the Evangeline Pass approval is vacated but then reissued, given the phased timeline for terminal construction. Regardless, any disruption is offset by the improvements to FERC's review on remand. *Standing Rock*, 985 F.3d at 1053; *Realty Income Tr. v. Eckerd*, 564 F.2d 447, 456 (D.C. Cir. 1977) ("The substantial additional costs which would be caused by court-ordered delay' may well be justified by the compelling public interest in the enforcement of NEPA.").

## CONCLUSION

For the reasons stated above, Sierra Club respectfully requests that the Court grant the petition and vacate FERC's Certificate Order.


Dated: March 29, 2023

Respectfully submitted,

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612

415-977-5695
nathan.matthews@sierraclub.org

Rebecca McCreary
Sierra Club
1650 38th St., Ste. 102W
Boulder, CO 80301
303-449-5595 ext. 103
rebecca.mccreary@sierraclub.org
*Attorneys for Sierra Club and*
*Healthy Gulf*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g)(1), I certify that the foregoing brief complies with:

1. the type-volume limitations established by this Court's November 18, 2022 briefing order, setting a limit off 5,750 words for Sierra Club and Healthy Gulf's reply brief, because this brief contains 5,708 words, excluding the parts of the brief exempted by Rule 32(f); and

2. the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

*Attorney for Sierra Club and Healthy Gulf*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of March, 2023, I have

served the foregoing Opening Brief for Petitioners Sierra Club and

Healthy Gulf, including the Addendum thereto, on all registered

counsel through the Court's electronic filing system (ECF).

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

*Attorney for Sierra Club and*
*Healthy Gulf*

34